And we'll hear from counsel in Brown vs. Kaz. MR. SHANNON Is Mr. Shannons. MR. SHANNON I would like to address the issue for which the supplemental briefing was requested a number of weeks ago, which was the application of the Supreme Court's recent decision in MR. SHANNON I would like to hear that. MR. SHANNON As the Supreme Court held in Gross under the Age Discrimination and Employment Act, the because of language in the act requires a plaintiff to show that age was the motivating factor, not necessarily the sole motivating factor, but a motivating factor in a decision, in an adverse employment decision. It's a similar argument as was made in the Price Waterhouse case back in 1989 that MR. SHANNON I thought the Supreme Court in Gross said it's a but-for test, right? MR. SHANNON Well, they keyed in on the because of language, but let me see if I can narrow your argument some by asking if you agree with something. MR. SHANNON Before Gross, there was some disagreement in the circuits, but if you had an ADEA claim or Title VII claim or presumably a 1981 claim, if you had some direct evidence, quote, unquote, quote, unquote, you could get a mixed motive instruction where any bad influencing factor, any motivating factor, would be enough to establish liability, and without that direct evidence, with only circumstantial evidence, you'd be in McDonnell-Douglas territory and you'd have pretext instructions going on. Do you agree with that so far?  SHANNON Yes, I agree. MR. SHANNON Okay. Gross comes along, and the Supreme Court says, you know what? Even though, in the face of Justice Stevens' dissent, pointing out that the ADEA is practically word-for-word drawn from Title VII, despite strong similarities in the statutes, when we look at the ADEA, we see a difference between it and Title VII, and because of that, that whole edifice of burden shifting that's been erected on the Title VII Foundation has no application, so it's not a question of whether you get a mixed motive or a pretext instruction or anything like that. It just has nothing to do with it. It's straight up but-for causation. Do you agree that that's what Gross says? MR. SHANNON I agree that's what Justice Thomas' opinion in Gross says, yes. MR. SHANNON That's what the majority says. So here we are. We've got 1981 in front of us. It's not like Title VII or the ADEA. So if a statute so similar as the ADEA and Title VII is such that the Supreme Court looks and it says, no burden shifting, just get away from that, it's not Title VII. Is the logical inference in dealing with 1981, a statute which in its language is very different from Title VII, that that whole burden shifting edifice has no foundation in a 1981 case either?  SHANNON No, I disagree. I believe the language of 1981 is plain, that all persons under the jurisdiction of the United States shall have the same rights to make and enforce contracts as do white citizens. MR. SHANNON So how does that lead to burden shifting? MR. SHANNON The burden is because the same, you have the same rights, that's equivalent rights. If you diminish that rights by even 1 percent, if a decision is made 1 percent based on race, those are no longer the same rights and the defendant must therefore have the burden to show that the decision would have been made but for race. MR. SHANNON How do you make that leap? You're going from a statement that 1981 provides for liability to an assertion that a burden shifting analysis is how you prove liability. What basis in law do you have for that? MR. SHANNON If you look at the 1991 amendments to Title VII where they add the, you know, any motive, if race plays any motivating factor in the decision, it shall be because of race. MR. SHANNON But the problem is that's not applicable to an independent contractor, correct? MR. SHANNON That is, and that's another issue that we could get into later is whether or not Ms. Brown actually was an independent contractor. But as to 1981 – MS. BROWN Well, isn't that a jury question? MR. SHANNON I believe it is, Your Honor. I think it's absolutely a jury issue and I think there are a number of factors that would render Ms. Brown an employee in this situation. MS. BROWN Really? MR. SHANNON And, you know, if we get to Title VII and that she's an employee, obviously this entire part of the argument is moot. But as to – if you look at the 1991 amendments to Title VII where you look at the, if any – if race is a motivating factor in the decision, that's essentially the same impact as has 1981, that if you're looking at both white citizens and all other citizens shall have the same rights, if you diminish that by any part, it's a motivating factor and is therefore prohibited. MR. BROOKS Right. You could say under the ADA if, in fact, the language is virtually the same. Congress was trying to outlaw the same kind of thing that Title VII hits, only they were doing it specifically as to age, therefore all the burden-shifting analysis should be the same. And, in fact, I think every court in the country was following that until Gross came along. So help me if you've got a basis – it's too soon for, I suppose, you to have a legal case to cite, but if you can give me a logical basis why burden-shifting is inherent in a 1981 case, that would help. MS. NULAND Are you arguing that it's inherent?  BROOKS Absolutely. MS. NULAND Go ahead. MR. BROOKS The only legal case I could give you is Hardy v. Town of Greenwich, which was a decision as of June 26th of this year. MS. NULAND Did you cite – did you cite that? MR. BROOKS No. It was only from June 26th, actually. MS. NULAND Okay. So what is the cite? MR. BROOKS It's a case from the District of Connecticut. And the court in Hardy ruled that the burden-shifting did apply and that there should be a jury instruction as to burden-shifting. It ruled that – MS. NULAND Was it a 1980 – what kind of case was it?  BROOKS It was a 1981 case. MS. NULAND It was a 1981 case. MR. BROOKS And the court ruled that Gross did not apply to 1981 cases. And the – MR. BROOKS Didn't it say, until the Second Circuit tells me otherwise, I've got to go with my Circuit's 1981 decisions? MR. BROOKS Which – MR. BROOKS I mean, that was sort of the extent of the analysis in Greenwich, wasn't it? MR. BROOKS Yes, except that they did say that, based upon the language of 1981, that because 1981 did not include the because of language, that the decision in Gross was really inapplicable. And – MS. NULAND So your position is that Gross is sui generis and the ADEA is sui generis because it has language that is not applicable or not found in either Title VII or 1981. Is that essentially your position? MR. BROOKS Essentially, yes. The language of the ADEA is essentially the same as it was in Title VII pre-1991 amendments. And the 1991 amendments to Title VII obviously changed the landscape of Title VII, and all  MS. NULAND Well, they came about to reverse the Supreme Court decision, as I recall, the amendments. MR. BROOKS Yeah, they were going after Price Waterhouse. MS. NULAND Exactly. MS. NULAND Yeah. MR. BROOKS And all Gross said is that Congress amended Title VII but failed to amend the ADEA, therefore the situation with the ADEA remained as it was between the decision in Price Waterhouse and the 1991 amendments. If you look at the decision in Mabra, which was the other case I was asked to analyze, Mabra answered the wrong question. Mabra answered the question, did the 1991 amendments change 1981? The answer is no, they didn't. The question they failed to ask is, did they need to?  BROOKS In fact, they specifically didn't. MR. BROOKS Yes. They failed to ask, was there any necessity to amend 1981, which is the decision in question the Ninth Circuit asked and came up with the other decision. No, there was no need to amend 1981. Price Waterhouse was not a 1981 decision. The plain language of 1981 allows for, you know, this motivating factor type theory. MR. BROOKS Well, that's right in the teeth of Gross, though, isn't it? I mean, Gross undertook the very same analysis that the Fifth Circuit did, or maybe it's  MR. BROOKS Eleventh. the Mabra case and said, it's clear that the 1991 amendments didn't amend Section 1981. They don't have applicability to that, but they did it. The Supreme Court said that in the context of asking the very question you're saying is the wrong question, which is whether or not the burden shifting of Price Waterhouse has some place in an ADEA suit.  BROOKS And in doing so, looked at the plain language of the ADEA, which was identical to the plain language of Title VII pre-1991. The plain language of 1981 is significantly different. It's not because of language. It's the same rights. And I think the plain language of 1981 indicates that white citizens have the same rights as all other citizens. All other citizens have the same rights as white citizens. That's not to say that a decision has to be based solely on race. If a decision is based 50 percent on race and 50 percent on some other motivating factor, that individual did not have the same rights as white citizens. White citizens had to have 100 percent based on a legitimate decision. If there's an insidious motive that creates 50 percent of the justification for a termination, that is not the same rights under 1981. What is the test that you're arguing that should be applied here? Essentially, the same test as would be applied under post-amendment Title VII. Which is? That the plaintiff would have the burden of showing that there was an insidious motive in the decision. And the defendant would then have the burden of showing they would have made the same decision but for that insidious motive. It's the Montoya position, right? It's the Ninth Circuit's majority's position. Yes, it is. And, you know, I think the Ninth Circuit went through a very well-reasoned analysis in reaching that decision. As opposed to the Mabra decision, which simply looked at the language of the statute and said, you know, the Eleventh Circuit said, did the amendments change the statute? No, they didn't. Therefore, we're going to reach the decision. Mabra is not reasoned. Mabra is a four-paragraph opinion. Exactly. It's really a cut and dry. It doesn't change the language. Therefore, it does not apply. You know, the Ninth Circuit went to an in-depth decision in coming up with its answer. And I would encourage the Court that that is the correct decision. It looks at the plain language of the statute. It looks at the history behind 1981 cases. In this particular case, getting to the facts of this case, there's a lot of evidence that is very much against your client, that they asked her to come by car. She didn't. She took a bus. She has a real concern about driving in places where it's unfamiliar and, I guess, is congested. She appeared to have an attitude issue. And in that context, can she win under any test? Absolutely. With regard to driving, Mr. Pesta testified that he didn't care how she got to her appointments. It wasn't really necessary for her to have a car. But the testimony also was that when they first spoke with her, I think it was Morris on the phone, suggested that she drive from Cleveland to Pittsburgh with a car because, one, she said she was a bit uncomfortable with that and they wanted to check and see how comfortable she was and was the car operable because you were operating within a 100-mile radius of where you worked from. And the defense admitted she told them she had a reliable car and they never inquired any further into it. Their inquiry ended then. She said she had a reliable car and they took it at that. With regard to her demeanor, her demeanor only became negative once there was this conversation. Well, the conversation on the deck, which one thing led to another and there was a racial comment or perhaps comments made back and forth, by the way. But in this case, it seemed as if we've got a person who this isn't the right job for her. And what they said is just it's not going to work. In fact, the president of the company, I think, did he not drive her back to the bus station? He did, yes. Because apparently it's impossible to find a taxi in Pittsburgh. Okay, thank you. We'll get you back in the puddle. You saved time.  Did you? Patrick? He saved time. Okay. Ms. Taylor. May it please the Court. Hillary Taylor on behalf of Jay Kaz, Inc. I may at times refer to Jay Kaz, Inc. as Kraftmatic because that is, in fact, the business's trade name. That's what we understand. It doesn't matter. Assuming that, you don't argue, do you, that 1981 is not applicable here? No, I do not argue that, Your Honor. Then, so assuming that 1981 is applicable, isn't there at least a jury question regarding whether Brown would have been fired or not hired, as the case may be, regardless of her race? I don't know that it necessarily becomes a jury question, Your Honor, because the facts of the case, viewed even in the light most favorable to Brown, were essentially undisputed on all of the facts and material to the analysis under 1981. There weren't any real disputed facts in this case relevant to the 1981 analysis. Well, then, wouldn't the jury have to decide whether race was a motivating factor in the decision not to employ her or not to continue hiring her? I mean, why can a court make that decision? Well, I think because it's based on the summary judgment standard, Your Honor, that allows courts to make decisions on cases. Well, if there are no disputed facts. Isn't whether it was motivating or not a disputed fact? I don't believe it is a disputed fact because the only... Why? Did the employer agree that race was a reason? No, absolutely not. Well, then it's disputed. Well, it became disputed only because Kimberly Brown's speculation that race was the motivating factor. She didn't produce any evidence other than her speculation or opinion. Wasn't there clearly a racial statement made to her by an employee of... Yes, there was. A terrible choice of words, Your Honor. All right. But then it's not just speculation. She didn't say, oh, he didn't say anything, but it was because I'm African-American that they didn't do this. I mean, he said it. And she also added to that, she claimed that in addition to when she refused to shake Morris' hands and he said something racial to her, she also claimed that during the argument that Morris stated, quote, well, you ain't nothing but the N-word, close quote, and shook his head in agreement when she asked him if he was calling her a nigger. In addition, so that's the second one, in addition, Brown claims that Morris stated that, well, you ain't nothing but a black person anyway. So she's got about four statements she claims that he made in addition to the one, or three, in addition to the one he admits that he made. Right. But even assuming all of those, and as the district court did, even assuming he made all of those statements, he still, the district court still found, and I believe the facts were undisputed, that Kraftmatic offered legitimate business reasons for their decision to terminate her, all of which you outlined earlier. And they may very well win at trial. They have, I think, a pretty good case. But the point here is, should this get past the summary judgment stage? Well, obviously. We didn't believe so, Your Honor. But, you know, I can, I see the argument. What's your, yeah, what's your legal argument, though, that looked at in the light most favorable to her? I mean, the best you could hope for, pre-Gross at least, is that you'd get a, I guess, a pretext instruction because you'd say there's no direct evidence of, or at least that's the argument in your paper, no direct evidence of racial animus by a decision maker, right? Well, I don't know, I don't know that I would, and perhaps my brief did indicate that I took issue with the presence of direct evidence. But I think that the argument on the deck may, in fact, be direct evidence that there was some sort of racial issue brought into the equation. Okay. For sure. All right. So you concede that, and if you concede that, then if we look at this in the light most favorable to the plaintiff, how could we not send this back for a jury to decide the question of whether there was a motivating factor involved here that involved race? Well, I believe under 1981, in the McDonnell-Douglas analysis, you know, she has to prove pretext, and I don't believe there's evidence of that. Well, she has to prove it, but the question is, that proof goes to a jury. Yeah. I mean, you know, she may have a difficult job. I mean, I tend to look at the record much like my colleague Judge Ambrose. Let me ask you another question. You contend that Brown failed to complete her homework, assignments during training, and that was the reason. But is there any evidence that Gurdie was aware of that when he fired Brown? I believe that there was evidence of that. I think that Mr. Gurdie's deposition testimony was a little, perhaps, scattered on... He testified that she did complete her assignments, and Brown also so testified at APA 360, APA 326. Okay. Well, I believe that it may have been that Mr. Pesta believed that she did not complete her homework assignments. Because he didn't do the firing. He did do the firing. He didn't make the decision to do the firing, but he did weigh in on the decision before Mr. Gurdie made the decision. Maybe you want a trial to resolve that issue. We don't want a trial, Your Honor. Just teasing. The persons on the deck... Yes. ...were Morris and Brown. Kugler was there, is that correct? Yes. And then Reinhart and Gibbs, the other trainees. Yes. Why were they not deposed? Reinhart and Gibbs. Ms. Kugler was deposed. I'm sorry, Reinhart and Gibbs. Mr. Reinhart and Mr. Gibbs are no longer employees of Kraftmatic. And we simply didn't... We didn't track them down and the plaintiffs didn't either for our purposes during discovery. Do you know where they are? No. I don't believe we were ever able to connect their last known address to them. How long were they with Kraftmatic? I believe they were both no longer there six months later. Okay. And then Kugler was deposed. Okay. Do you want to make any comment with respect to the applicability of gross beyond that which Judge Morton... Beyond the ADEA. Yeah, or beyond what Judge Jordan made. I think that Ms. Brown's counsel and I both agree that gross simply doesn't change the law as it applies in this case. It doesn't change any of the content of my brief and doesn't change Kraftmatic's opinion about how the law should be applied to these facts. Thank you for that very candid statement. The one issue we didn't address, and I'd be happy to if the court would like me to, is the issue of whether Ms. Brown was, in fact, an independent contractor protected by Title VII and the PHRA. I believe it's clear. I think the language of the PHRA... You mean that's distinguished from an employee? Absolutely. And I think the language of the PHRA, as opposed to how Brown argues, does, in fact, clearly eliminate Ms. Brown's independent contractor position from the kind of independent contractors covered by the PHRA. But you agree that 1981 applies to independent contractors? Yes. Yes, I do. I don't think you have to get into the other part. Do you have anything else? Okay, thank you very much. Thank you, Your Honors. Mr. Jennings? Thank you. If I may just address one very quick thing. Mr. Gibbs and Mr. Reinhart had both left the State or outside the subpoena jurisdiction. We had phone numbers for them, and they were not going to give us their home address when I spoke to them. They didn't want to be the first. They were not the most friendly people I've ever met. Just one thing very, very briefly. Assuming this is a mixed-motive case, and the pre-gross mixed-motive analysis applies... I don't think you have to assume it anymore. Your opponent has conceded. What's important here is the defendant has the burden of proof to show that the same decision would have been made but for the plaintiff's race. And that's what renders this a jury claim. You've got a very good picture as a potential independent contractor, if you read the whole record. Did she? Up until the point where there was a dispute on the deck, I think she was a fine example. She wouldn't drive to the meetings when she was told, hey, you should drive. This is somebody who's going to have to drive to appointments. She wouldn't shake hands with the instructor supervisor. She made comments during the introduction that got her off on the wrong foot. And she apparently lost her temper. All things that every company wants in a salesperson, right? With regard to why she didn't drive, it was actually unique to the Pittsburgh area and it does not appear in the record, but she hates tunnels, which don't appear in Ohio, where she lives. Well, she might have to go through a tunnel. There aren't too many tunnels in Ohio. There aren't any tunnels? With regard to her losing her temper... There's no tunnels at all. With regard to her losing her temper, she lost her temper after her race was brought into a discussion. And I don't think that's unreasonable for an employee to react the way she did once her race is brought in the way that... The undisputed record is, she wouldn't even engage in the common courtesy of a handshake before any racial comment was made. Nobody disputes that, right? No one does dispute that. She was asked to shake his hand and she said, no, I'd like to talk to you before that. That's a chip on your shoulder, isn't it? Yeah, and then she said she wanted to talk with Morris' wife, Alma, or something. None of this made a whole lot of sense. That is very much in dispute. Ms. Brown disputed that very much at her deposition. That was not in her testimony. That was only in Mr. Morris' testimony. Well, all we're saying is that, at most, it's a jury... You're certainly not claiming you're entitled to summary judgment. Absolutely not. I did not request that. Okay. All right. I think we understand the position. Thank you very much. Thank you very much. We'll take the matter under advisement.